http://www.va.gov/vetapp16/Files3/1626426.txt

Citation Nr: 1626426 
Decision Date: 06/30/16 Archive Date: 07/11/16

DOCKET NO. 95-04 999 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Phoenix, Arizona

THE ISSUES

1. Entitlement to a total disability rating based on individual unemployability due to service-connected disabilities (TDIU), prior to September 12, 2000. 

2. Entitlement to an effective date earlier than April 9, 2001, for the grant of basic eligibility to Dependents' Educational Assistance (DEA) benefits. 

REPRESENTATION

Veteran represented by: Disabled American Veterans

WITNESSES AT HEARINGS ON APPEAL

The Veteran and A.S.

ATTORNEY FOR THE BOARD

B. Garcia, Associate Counsel

INTRODUCTION

The Veteran served on active duty from October 1970 to September 1973, and from September 1973 to October 1976. 

This matter comes before the Board of Veterans' Appeals (Board) from rating decisions of the Department of Veterans Affairs (VA) Regional Office (RO) in Phoenix, Arizona. 

In April 1996 and November 1999, the Veteran testified at hearings before a Decision Review Officer at the Phoenix RO. Transcripts of these proceeding are associated with the electronic record. 

In April 1999, the RO, in pertinent part, granted service connection for major depressive disorder and dysthymia (depression) as secondary to service-connected Achilles tendonitis, and granted a 30 percent disability rating, effective May 3, 1994. The Veteran subsequently appealed the initial rating assigned to his depression. 

In July 2002, the RO, in pertinent part, increased the Veteran's evaluation for depression from 30 to 100 percent, effective April 9, 2001; established basic eligibility to DEA benefits from April 9, 2001; and concluded that entitlement to a TIDU was moot given the award of a 100 percent evaluation for service-connected depression. 

The Veteran, through his attorney, filed a notice of disagreement in July 2002, indicating that he disagreed with April 9, 2001 effective date contained in the July 2002 rating decision and maintaining that he was entitled to a TDIU as of May 1994, the date he filed his service connection claim for depression, dysthymia, and PTSD. In a March 2003 Statement of the Case (SOC), the RO denied entitlement to a TDIU prior to April 9, 2001 and to an earlier effective date for a 100 percent rating for depression, but it did not address the effective date for DEA benefits. 

In an October 2004 decision, the Board granted an effective date of September 12, 2000 for the 100 percent rating for service-connected depression but remanded the issue of entitlement to a TDIU for additional development. In September 2006, the Board, in pertinent part, denied entitlement to a TDIU prior to September 12, 2000. 

The Veteran subsequently appealed the Board's decision to the United States Court of Appeals for Veterans Claims (Court). The appellant, through counsel, and the Secretary of Veterans Affairs submitted a Joint Motion to Vacate and Remand (joint motion), requesting that the Board's decision with respect to the TDIU issue be vacated and remanded on the ground that the Board erred by not ensuring that VA issue an SOC with regard to an earlier effective date for ancillary DEA benefits. In March 2008, the Court granted the joint motion and remanded the case to the Board for further appellate review. 

This case was last before the Board in October 2008, when it was remanded for the RO to issue an SOC regarding the issue of entitlement to an effective date earlier than April 9, 2001, for the grant of basic eligibility to DEA benefits and for the RO to readjudicate the claim of entitlement to a TDIU prior to September 12, 2000. 

In May 2014, the RO issued a rating decision establishing basic eligibility to DEA benefits from September 12, 2000. However, the RO has not issued an SOC with respect to the issue of an earlier effective date for DEA benefits. Thus, as will be explained below, the Board must remand this issue for the RO to issue an SOC. 

This is a paperless appeal located on the Veterans Benefits Management System (VBMS). Documents contained on the Virtual VA paperless claims processing system are either duplicative or not pertinent to the instant appeal. 

The issue of entitlement to an effective date earlier than April 9, 2001, for DEA benefits is addressed in the REMAND portion of the decision below and is REMANDED to the Agency of Original Jurisdiction (AOJ). VA will notify the Veteran if further action is required. 

FINDING OF FACT

The preponderance of the evidence is against a finding that the Veteran's service-connected disabilities rendered him unable to secure or follow substantially gainful employment for the period prior to September 12, 2000. 

CONCLUSION OF LAW

The criteria for a TDIU, prior to September 12, 2001, have not been met, and referral to the Director of Compensation Service for extra-schedular consideration is not warranted. 38 U.S.C.A. § 1155 (West 2014); 38 C.F.R. § 3.340, 3.341, 4.16 (2015). 

REASONS AND BASES FOR FINDING AND CONCLUSION

I. Stegall Compliance

The Board remanded the Veteran's claim of entitlement to `a TDIU in October 2004, as it was inextricably intertwined with the Veteran's service connection claim for PTSD. The Board instructed the RO to request that the Veteran provide evidence in his possession that pertained to his claim, and to inform him of the requirements for establishing entitlement to a TDIU on an extraschedular basis. The RO was instructed to subsequently readjudicate the Veteran's claim of entitlement to a TDIU prior to April 9, 2001. In compliance with the Board's directives, the RO sent a VA notice letter to the Veteran in March 2005, and the RO readjudicated the Veteran's claim in a May 2006 Supplemental Statement of the Case (SSOC). 

Following the Court's March 2008 order, the Board remanded both of the Veteran's claims for additional development in October 2008. As to the Veteran's claim of entitlement to a TDIU prior to September 12, 2000, the Board instructed the Agency of Original Jurisdiction (AOJ) to readjudicate the claim after considering any new evidence and to furnish the Veteran with an SSOC if the disposition remained unfavorable. In a May 2014 Supplemental Statement of the Case, the AOJ readjudicated the Veteran's claim. Accordingly, with respect to the issue of entitlement to a TDIU prior to September 12, 2000, the Board finds substantial compliance with its prior remand instructions. See Stegall v. West, 11 Vet. App. 268, 271 (1998) (providing that the Board errs as a matter of law when it fails to ensure compliance with its prior remand instructions). 

II. Veterans Claims Assistance Act of 2000 (VCAA)

The VCAA, codified in part at 38 U.S.C.A. §§ 5103, 5103A, and implemented in part at 38 C.F.R. § 3.159, amended VA's duties to notify and to assist a claimant in developing information and evidence necessary to substantiate a claim.

 Duty to Notify

When VA receives a complete or substantially complete application for benefits, it will notify the claimant of: (1) any information and medical or lay evidence that is necessary to substantiate the claim; (2) what portion of the information and evidence VA will obtain; and (3) what portion of the information and evidence the claimant is to provide. 38 U.S.C.A. § 5103(a); 38 C.F.R. § 3.159(b). While notice is generally required before the RO renders its initial unfavorable adjudication, defects in notice requirements may later be cured. See Prickett v. Nicholson, 20 Vet. App. 370, 376-77 (2006). The RO provided VCAA notice addressing entitlement to a TDIU, in addition to entitlement to an earlier effective date, by letter, in March 2005. The Board finds that VA has therefore fulfilled its duty to notify the Veteran. 

 Duty to Assist

VA has fulfilled its duty to assist in obtaining identified and available evidence needed to substantiate the Veteran's claim. See 38 U.S.C.A. § 5103A(a)(1); 38 C.F.R. § 3.159(c). VA and private medical treatment records, Social Security Administration (SSA) records, employer statements, and lay statements have been associated with the record. 

With respect to private treatment records, the Board finds that all appropriate attempts have been made to obtain adequately identified records. The Board notes that in February 1997, prior to his claim of entitlement to a TDIU, the Veteran submitted a release form for VA to obtain treatment records from University Hospital dating between 1977 and 1978. In June 1997, University Hospital indicated that the patient could not be identified; the Veteran was informed of University Hospital's negative response in a September 1997 SSOC pertaining to service connection for PTSD, depression, and dysthymia; and for Achilles tendonitis of the left ankle. The Veteran has not subsequently submitted treatment records from this provider, nor has he otherwise informed VA of additional information that may be used to obtain treatment records from this provider. In light of this history, the Board finds that VA has made reasonable efforts to obtain adequately identified private treatment records, and no further efforts to obtain treatment records are required for VA to comply with its duty to assist. See 38 U.S.C.A. § 5103A(b); 38 C.F.R. § 3.159(c)(1); Hayes v. Brown, 5 Vet. App. 60, 68 (1993) (noting that VA's duty to assist is not a "one-way street" and that a claimant has a duty to cooperate with VA in developing evidence). 

In general, VA must provide a medical examination or obtain a medical opinion when necessary to decide a claim. See 38 U.S.C.A. § 5103A(d); 38 C.F.R. § 3.159(c)(4). The Veteran was afforded several VA examinations pertaining to his service-connected disabilities during the course of this appeal. The Board has carefully reviewed the VA examination reports and finds that the examinations, taken as a whole along with other medical evidence of record, contain sufficient findings to determine whether entitlement to a TDIU is warranted prior to September 12, 2000. Thus, the Board finds that it has no further duty to obtain a VA examination or medical opinion prior to adjudicating the instant appeal. See 38 C.F.R. § 3.326. 

As there is no indication of any outstanding relevant evidence, the Board concludes that no further assistance to the Veteran in developing the facts pertinent to his claim is required for VA to comply with its duty to assist. 

III. Entitlement to a TDIU prior to September 12, 2000

 Legal Criteria

It is the established policy of VA that all veterans who are unable to secure and follow a substantially gainful occupation by reason of service-connected disabilities shall be rated totally disabled. See 38 C.F.R. § 4.16. A finding of total disability is appropriate when there is present any impairment of mind or body that is sufficient to render it impossible for the average person to follow a substantially gainful occupation. 38 C.F.R. §§ 3.340(a)(1), 4.15. 

"Substantially gainful" employment is employment that is "ordinarily followed by the nondisabled to earn their livelihood with earnings common to the particular occupation in the community where the veteran resides." See Moore v. Derwinski, 1 Vet. App. 356, 358 (1991) (adding that the definition of substantially gainful employment suggests a living wage). Marginal employment is not considered substantially gainful employment. See 38 C.F.R. § 4.16(a); see also Moore, 1 Vet. App. at 358 ("The ability to work only a few hours a day or only sporadically is not the ability to engage in substantially gainful employment."). 

A TDIU may be assigned if the schedular rating is less than total when it is found that the veteran is unable to secure or follow a substantially gainful occupation because of service-connected disabilities. See §§ 38 C.F.R. 3.340, 3.341, 4.16(a). If there is only one such service-connected disability, it must be ratable at 60 percent or more. 38 C.F.R. § 4.16(a). If there are two or more such disabilities, at least one disability must be rated at 40 percent or more, and there must be sufficient additional service-connected disability to bring the combined rating to 70 percent or more. Id. Where applicable, disabilities resulting from a common etiology are considered a single disability for the purpose of satisfying the percentage standards set forth in 38 C.F.R. § 4.16(a). Id. 

Where the schedular criteria set forth above are not met, but a veteran is nonetheless found to be unemployable by reason of service-connected disabilities, VA shall submit the case to the Director of Compensation Service for extraschedular consideration. See 38 C.F.R. § 4.16(b). Although entitlement to extraschedular TDIU is determined in the first instance by VA's Compensation Service Director, the RO and the Board are tasked with making the threshold determination that referral to the Director for extraschedular consideration is appropriate. Id.; see Bowling v. Principi, 15 Vet. App. 1, 10 (2001). That threshold determination must be supported with "a full statement as to the veteran's service-connected disabilities, employment history, educational and vocational attainment and all other factors having a bearing on the issue." 38 C.F.R. § 4.16(b). 

A TDIU claim presupposes that the rating for the service-connected condition is less than 100%, and only asks for a TDIU because of subjective factors that the objective rating does not consider. See Vettese v. Brown, 7 Vet. App. 31, 34-35 (1994). Thus, in evaluating a veteran's employability, consideration may be given to his level of education, special training, and previous work experience in arriving at a conclusion, but not to his age or to impairment caused by non-service-connected disabilities. See 38 C.F.R. §§ 3.341(a), 4.16, 4.19. 

Finally, the Court has held that a request for a TDIU, whether raised expressly by a veteran or reasonably raised by the record, is not a separate claim for benefits. See Rice v. Shinseki, 22 Vet. App. 447, 453 (2009). Instead, it involves an attempt to obtain an appropriate rating for a disability or disabilities, either as part of the initial adjudication of a claim, or as part of a claim for increased compensation. See id. (adding that the distinction is important for purposes of assigning an effective date for an award of compensation). When entitlement to a TDIU is raised during the adjudicatory process of the underlying disability or during the administrative appeal of the initial rating assigned for that disability, it may be considered part of the claim for benefits of the underlying disability. See id. at 454; see also Mayhue v. Shinseki, 24 Vet. App. 273, 281-82 (2011). 

 Factual Background

The Veteran contends that he is entitled to a TDIU prior to September 12, 2000, the date he was awarded a 100 percent rating for service-connected depression. As set forth in a February 2005 statement, the Veteran maintains that he is entitled to a TDIU as of April 28, 1994, the date he states he filed his original claim of entitlement to service connection his service-connected disabilities. The Board observes that the Veteran's service connection claim was not received by VA until May 3, 1994, the effective date of the award of service connection for all of his service-connected disabilities. 

In his TDIU application, the Veteran reported that he last worked full-time in 1987 as a laborer and that he became too disabled to work in 1989. Based on a June 2001 list of previous employers and the Veteran's statements, his last employer was Flagstaff Medical Center, where he worked as a boiler room operator. The June 2001 employer history lists a variety of employers between 1976 and 1989, including health care providers, a hotel, an asphalt company, a lumber yard, a mining company, and VA; it did not indicate the type of work the Veteran performed for each employer. However, as set forth in his testimony from a November 1999 hearing before a VA Decision Review Officer, the Veteran worked primarily in the labor sector. According to the Veteran's TDIU application and other evidence of record, he completed one year of college, and he has had additional training in construction drafting and medical administration. 

The Veteran's service-connected disabilities include depression, rated at 30 percent as of May 3, 1994, and 100 percent as of September 12, 2000; Achilles tendonitis, left ankle, rated as noncompensable as of May 3, 1994; and fracture of nasal bone, rated as noncompensable as of May 3, 1994. The Veteran's combined evaluation for VA compensation purposes was 30 percent beginning May 3, 1994, and 100 percent beginning September 12, 2000. As the relevant period for the Veteran's claim of entitlement to a TDIU is prior to September 12, 2000, his service-connected disabilities have not met the percentage rating standards for a schedular TDIU throughout the course of this appeal. See 38 C.F.R. § 4.16(a). Nevertheless, where, as here, the Veteran's service-connected disabilities did not meet the requirements for a schedular TDIU, entitlement to a TDIU may be considered on an extraschedular basis. 38 C.F.R. § 4.16(b). 

In March 1994, the SSA awarded the Veteran disability benefits beginning November 15, 1990. The primary diagnosis associated with the award of Social Security disability benefits is severe depression; the secondary diagnosis is personality disorder. The Veteran's functional impairments due to his disabilities were found to be severe, as the consultative psychologist found marked restrictions upon the Veteran's activities of daily living and social functioning, and there were often interruptions in concentration, persistence, and pace. 

According to a May 1994 VA mental health treatment record, the Veteran presented to the mental health clinic with a variety of "social issues," including a history of alcohol abuse with 6 or 7 DUIs. The treatment record also notes that the Veteran had recently spent 15 days in jail for a domestic violence-related issue. No diagnosis was rendered, and the treatment plan was for the Veteran to follow-up with scheduled mental health appointments. 

According to a June 1994 VA foot examination report, the Veteran provided that following his Achilles tendon injury, he continued to have pain and difficulty walking. However, over a period of several years after receiving injections in the ankle area, his symptoms improved to the extent that he acknowledged being relatively asymptomatic at the time of the examination. On physical examination, there was normal range of motion of the left foot and ankle. The Veteran was able to heel and toe walk satisfactorily, though it was noted that he tended to favor the left foot and ankle. The examiner's impression was history of left Achilles tendon, chronic Achilles tendonitis. 

A June 1994 VA X-ray report pertaining to the Veteran's left ankle noted plantar spurring but no evidence of any acute processes. There were some osteophytes seen on the posterior-superior surfaces of the calcaneus. Beginning hallux valgus was noted, but there was otherwise no evidence of significant post-traumatic changes noted in ankle joint. The plafond appeared normal, and there was no evidence of any loose bodies in the Veteran's ankle joint. 

The Veteran was afforded a VA PTSD examination in July 1994. The Veteran reported that he had been depressed since 1971 and that his depression was manifested by a disturbance of sleep, appetite, and concentration. He stated that he had difficulty trusting others and that he did not have any friends. He reported that his last job was in 1989 and that he had not been able to hold a job for several years. The Veteran admitted to suicidal thoughts, adding that the only thing that kept him from committing suicide was his son, as he could not trust anyone to care for him. The Veteran expressed low self-esteem and reported problems with alcohol and drug abuse; the last time he completed a substance abuse program was in 1988. The Veteran was taking Zoloft and anti-anxiety medication. The Veteran was marginally groomed, and his affect was appropriate, but blunted. There was no evidence of suicidal or homicidal ideations, or of psychosis. His functions were grossly intact. The diagnoses rendered included PTSD, chronic and severe in degree; substance abuse disorder; and alcohol abuse. The Veteran's global assessment functioning (GAF) score was approximately 35. 

A September 1994 VA psychiatry treatment record provides that the Veteran complained of domestic-related problems with his girlfriend, in addition to concerns regarding a pending court date. The Veteran was not exhibiting suicidal ideations. A December 1994 VA psychiatry note indicates that the Veteran was binge drinking and was arrested again. The examiner noted that the Veteran was quiet, intense, and had a "rather helpless" attitude; additionally, the Veteran seemed to blame others, such as the police or his girlfriend, rather than take personal responsibility for certain actions. 

In April 1995, the Veteran was admitted to a VA substance abuse treatment program. The admitting diagnoses were alcohol abuse, marijuana abuse, and depression. According to a May 1995 medical record report, the treatment program was court-ordered due to a December 1994 domestic violence charge. The report notes that the Veteran had two previous suicide attempts, in 1976 and in 1978, and that he was depressed and fantasized about suicide. On mental status examination, the Veteran's mood and affect was noted to be generally appropriate. The Veteran looked depressed, and his insight was noted to be very poor. The Veteran's long- and short-term memory was intact, and with respect to his judgment skills, the Veteran responded appropriately to his environment. The summary of findings noted that the Veteran was an alert and oriented male who had issues of codependency, ACA, anger, spirituality, depression, and grief over his son's death. The Veteran's diagnoses on discharge included alcohol dependence, continuous; history of polysubstance abuse; and depression. 

Following the substance abuse treatment program, the Veteran was admitted to the VA Domiciliary Aftercare Program in May 1995. In June 1995, he was discharged from the aftercare program and admitted to a residential support program, where he participated in group therapy. On discharge from the aftercare program, the Veteran reported that he felt depressed and guilty over how his addiction had affected his family; however, he noted that overall, he was feeling and sleeping well. In September 1995, the Veteran was discharged from the residential support program group after group participants voted to expel him, as he was in denial regarding his alcoholism. 

A January 1996 VA mental health treatment record provides that the Veteran had increased positive energy, had begun volunteering at a hospital, and had a positive outlook; the treating provider wrote that were no symptoms of clinical depression. A January 1996 private psychological evaluation, completed within the context of a custody proceeding, included a diagnosis of alcohol dependence without physiological dependence in early full remission. According to the provider, there were no other applicable Axis I diagnoses pertaining to mental illnesses or disorders. When asked about his depression, the Veteran reported that he was no longer experiencing symptoms, noting that his medications were helping with his depression. The Veteran's GAF score was 52, and it was noted that his symptoms were moderate. 

In an April 1996 statement in support of his claim for service connection for depression, the Veteran reported that following service, he drank excessively, was once arrested three times for driving under the influence in one month, attempted suicide in 1977, could not hold a job, and had been homeless. The Veteran reported that although medication was helping with his anxiety and sleep difficulties, he still suffered from depression and experienced headaches, irritability, and had difficulty maintaining relationships. 

In an April 1996 affidavit, three members of the Veteran's family reported that the Veteran returned from service in Vietnam with a cast on his left leg and displayed sadness that remained after the case was removed. The Veteran's family recalled that he had been admitted to VA Medical Center after a suicide attempt. They indicated that following service, the Veteran was not able to hold a job because of the pain and discomfort in his legs and feet. 

An April 1996 VA mental health treatment record provides that the Veteran had been finding himself easily irritable and worried about minutiae. There was no evidence of suicidal ideations. The Veteran was noted to be pleasant, despite the noted chronic worries. The treating provider wrote that the Veteran can be "fatalistic" but was not clinically depressed and had no thought disorder. 

As set forth in an August 1996 VA mental health treatment record, the Veteran complained of having no social life. He was noted to have some depression without suicidal ideation. 

A June 1997 VA mental health treatment record indicates that the Veteran reported sleep difficulty over the three months prior, in addition to weight loss and fatigue. The Veteran reported being depressed and detailed that he felt disinterested. The Veteran provided that he had suicidal thoughts approximately once every two months, but he also indicated that he knew suicide was not a good option, given that he was his son's primary caretaker. It was noted that the Veteran had recently completed a word-processing course at Yavapai College. The Veteran was alert, oriented, and pleasant; he was noted to be moderately depressed, not suicidal. 

At a January 1998 VA mental health treatment, the Veteran complained of depression and anxiety most of his life. The treatment record provides that the Veteran took community college classes the previous semester; he performed well in one class and was planning to take classes again in the spring. The Veteran was waking during the night but sleeping eight hours at night. His thoughts were goal directed, his mood was variable and improved on medication, and he had no hallucinations or suicidal ideations. The assessment was major depression, recurrent, improved overall. A March 1998 VA mental health treatment record provides that the Veteran's sleep was "good," but he had little energy. There was no evidence of suicidal ideations or hallucinations. The Veteran's thoughts were goal-directed. The assessment was major depression, recurrent, improved/stable overall. 

A July 1998 VA treatment record provides that the Veteran complained of a chronic sleep disorder. There were no signs of suicidal or homicidal ideations, and the Veteran's insight and judgment were not impaired. The assessment was depression, recurrent, in partial remission; and anxiety disorder, NOS. The Veteran's GAF score was 65. 

The Veteran was afforded a VA mental disorders examination in September 1998. The Veteran's chief complaints included an inability to concentrate, a lack of interest, and the fact that he was raising a child on his own. The Veteran reported that he did not have the job skills to work and could not be on his feet very long due to the effects of his Achilles tendon injury. The Veteran was enrolled in part-time coursework. He reported earning a D on an accounting test due to difficulty concentrating, but he also reported receiving an A on an English test. The Veteran stated that his grade point average was 3.5. The Veteran reported a decreased frequency of suicidal thoughts since beginning medication in 1992, and he provided that he last thought about suicide approximately one month prior. The Veteran reported an improvement in sleep and in social avoidance. However, with respect to the 12 months preceding the treatment, the Veteran reported the following limitations in activities and abilities: an inability to work or look for work; feelings of disinterest; and a lack of goals. According to the examiner, the Veteran's social, employment, and economic situation was consistent with a diagnosis of recurrent major depressive disorder, moderate episode, and dysthymia. The examiner added that although the Veteran indicated that he was impaired in social and vocational contexts, he was attending school part-time, with a 3.5 GPA, and was raising a nine-year-old child with ADHD and fetal alcohol effect syndrome as a single parent. The examiner assigned a GAF score of 55 for the current and past year. 

At a February 1999 VA psychiatry treatment, the Veteran complained of sad mood and irregular sleep despite the use of medication, but he was not suicidal, homicidal, or hallucinating. The Veteran was attending the local community college part-time to study medical administration. According to an August 1999 VA psychiatry treatment record, the Veteran reported that he was feeling fairly well, but he expressed pessimism about failing a class at school. 

In an August 1999 VA Form 9 pertaining to the 30 percent evaluation that had been assigned to his service-connected depression, the Veteran stated that his condition warranted a higher rating due to his employment history. Specifically, the Veteran stated that he could not hold jobs or relationships. 

At a November 1999 DRO hearing pertaining to the 30 percent evaluation that had been assigned to his service-connected depression, the Veteran maintained that the depression he had experienced since service prevented him from maintaining or sustaining gainful employment. The Veteran described how he was terminated from his last position as a boiler operator due to missing work, and he maintained that following service, the longest he was able to maintain a job was approximately 11 months. The Veteran provided that the major contributing factor to his inability to keep a job for any significant period of time was his emotional instability and inability to communicate and work with others. The Veteran also described the various job training programs and coursework he had completed since he was last employed in 1989, including a nursing assistant certification and coursework at Yavapai College for medical-related certification. 

As set forth in January 2000 and March 2000 VA psychiatry treatment records, the Veteran was pleasant and calm. There were some residual depressive symptoms but no suicidal or homicidal ideations. The Veteran was registered for community college courses. At the January 2000 treatment specifically, the Veteran was assigned a GAF score of 65. 

A May 2000 VA mental disorders examination report provides that the Veteran's chief complaints included a lack of motivation and interest, easy irritability, and a need for increased sleep. The Veteran reported a depressed mood most of the time; he stated that while suicidal thoughts crossed his mind, he had no current plans or intent. At the examination, the Veteran stated that he was fired from his last position as a boiler room attendant for failure to report to work, which he attributed to his drinking. He reported that following service, he would only maintain jobs for approximately two to four months. He stated that he was fired from some positions, and that he voluntarily left others, largely due to his inability to get along with others. He stated that he was not currently working because he did not feel that he had the necessary skills and that he was not sure if he would be able to work with others due to his history. The Veteran was taking classes part-time for certification in medical administrative assistance but stated that he sometimes had to force himself to do school assignments. The examiner provided that the Veteran's thought processes were goal directed, logical, and coherent. There were no signs of preoccupations such as suicidality, homicidality, or paranoia. The Veteran's judgment for hypothetical situations was intact, and his insight into current life situations was largely apparent. 

The examiner's assessment was major depressive disorder, recurrent, current episode moderate; dysthymia; and alcohol dependence, in remission. With respect to any impairment in social and vocational contexts, the examiner stated that although the Veteran reported that his depression interfered with school, he continued to attend on a part-time basis and obtained a B and a C in his last courses. The examiner added that the Veteran identified a goal of becoming a medical administrative assistance and entered a mentoring program to help achieve this goal. Additionally, the Veteran was raising a ten-year-old son who was diagnosed with ADHD and fetal alcohol syndrome. As such, the examiner opined that while the Veteran's functioning may fall at the low end of the moderate impairment spectrum, his disability did not warrant a finding of severe impairment given his current functioning at school and with his family. The examiner rendered a GAF score of 53 for both the current and past year. 

In April 2001, the Veteran filed an application for a TDIU via a VA Form 21-8940, in which he provided that his depression prevented him from securing or following any substantially gainful occupation. 

July 2001 responses from identified former employers did not elicit any history of the Veteran working for them in the five years preceding their responses. However, in an August 2001 VA Form 21-4192, a former employer indicated that the Veteran was terminated from his position as a boiler operator in July 1989 after failing to report to work. 

 Analysis

As an initial matter, although the Veteran did not file a formal application for a TDIU until April 2001, the Board finds that the Veteran raised the issue of entitlement to a TDIU in August 1999, when he indicated in a VA Form 9 that he could not maintain employment due to his service-connected depression. See Rice, 22 Vet. App. at 453-54. Thus, as the Veteran raised the issue of unemployability within a year of the RO's April 1999 grant of service connection for depression, it is appropriate to consider evidence of unemployability as far back as the date of the Veteran's underlying initial claim for service connection. See id.; Mayhue, 24 Vet. App. at 281-82. 

When considering the Veteran's service-connected disabilities, their impact on his occupational functioning, and factors such as his employment and education history, the evidence of record is against a finding that the Veteran's service-connected disabilities rendered him unemployable prior to September 12, 2000. As such, the Board finds that referral of the Veteran's case to the VA Director of Compensation Service for extraschedular consideration is not warranted. 38 C.F.R. § 4.16(b). Although the Veteran has maintained that his service-connected disabilities prevented him from securing or following a substantially gainful occupation prior to September 12, 2000, this assertion is inconsistent with other, more probative evidence of record. See Caluza v. Brown, 7 Vet. App. 498, 511 (1995). In this regard, the Board finds that the September 1998 and May 2000 VA examination reports, in addition to VA treatment records dated prior to September 12, 2000, offer the strongest and most persuasive evidence regarding the impact of the Veteran's service-connected disabilities on his occupational functioning. 

As set forth above, the VA examiner who conducted the September 1998 and May 2000 examinations acknowledged that the Veteran maintained that he was unable to work, primarily due to service-connected depression. Specifically, the Veteran provided that he was unable to maintain employment due to his lack of interest, motivation, and goals, in addition to his inability to work with others. However, the examiner found that the Veteran's depression was moderate. She stressed that although the Veteran reported that he was unemployable, he was attending community college classes on a part-time basis. In September 1998, the examiner noted that the Veteran reported a 3.5 GPA, and in May 2000, she wrote that the Veteran obtained a B and a C in his latest coursework. The examiner also stressed that the Veteran was raising a child with ADHD and fetal alcohol effect syndrome as a single parent. Additionally, in May 2000, the examiner found that the Veteran's thought processes were goal-directed, and she noted that the Veteran had identified a goal of becoming a medical administrative assistant and entered a mentoring program to help achieve this goal. 

The September 1998 and May 2000 VA examiner's opinions regarding the severity of the Veteran's depression and its impact on his social and occupational functioning are generally consistent with his prior mental health treatment records. Mental health records dating from January 1996 to July 1998 reflect that during this period, treating providers generally found that the Veteran did not display symptoms of clinical depression, or that his moderate depression was improving. For instance, the January 1996 VA mental health provider, the January 1996 private psychologist, and April 1996 VA mental health provider found no symptoms of clinical depression. The January 1996 VA provider stressed that the Veteran had increased positive energy and a positive outlook, and that he began volunteering at a local hospital. Similarly, the January 1996 private psychologist concluded that aside from a diagnosis of alcohol dependence in early full remission, there were no other applicable Axis I diagnoses pertaining to mental illnesses or disorders. The April 1996 VA mental health provider acknowledged the Veteran's reports of irritability and worries about minutiae, but ultimately opined that although the Veteran could be "fatalistic," he was not clinically depressed and had no thought disorder. While August 1996 and June 1997 VA treatment records indicate that the Veteran had "some" or moderate depression, which reportedly included suicidal thoughts approximately once every two months, he was not noted to be suicidal. Further, January and March 1998 VA mental health treatment records noted that the Veteran's depression was improved and/or stable overall. His thoughts were goal-directed, he did not exhibit suicidal ideations, he was taking community college coursework, and he was sleeping approximately eight hours per night. A July 1998 VA mental health provider found that the Veteran's depression was in partial remission, noting that there were no signs of suicidal ideations, and his insight and judgment were not impaired. 

Prior to January 1996, VA mental health and substance abuse treatment program records demonstrate that the Veteran received treatment for domestic-related issues, legal problems, and substance abuse, but they do not suggest that the Veteran was unable to maintain or to secure substantial gainful employment due to depression. For instance, on mental status examination in May 1995, although the Veteran's insight was noted to be poor, his long-term and short-term memory was intact, and with respect to his judgment skills, the treating provider found that he responded appropriately to his environment. 

The Board acknowledges that the July 1994 PTSD examination report reflects a GAF score of 35 for chronic severe PTSD, substance abuse disorder, and alcohol abuse. However, this GAF score was associated with non-service connected conditions. Further, even assuming, for the purposes of this decision, that the GAF score of 35 corresponded to symptoms associated with the Veteran's service-connected depression, it is inconsistent with other GAF scores rendered prior to September 12, 2000. Specifically, recorded GAF scores prior to this date generally fell between 52 and 65. Accordingly, the Board affords limited probative value to the July 1994 examination report. 

Although he has primarily maintained that his service-connected depression has prevented him from securing or maintaining employment, the Board has also considered the impact of the Veteran's other service-connected conditions, particularly, his Achilles tendonitis of the left ankle. For instance, at the September 1998 VA examination, the Veteran reported that with respect to functional limitations due to service-connected disability, he could not be on his feet very long due to the effects of his Achilles tendon injury. However, at the June 1994 VA foot examination, the Veteran reported that while he experienced pain and difficulty walking following his injury, he was relatively asymptomatic after receiving injections in the ankle area over a period of several years. On physical examination, there was normal range of motion of the left foot and ankle, and the Veteran was able to heel and toe walk satisfactorily despite a tendency to favor the left foot ankle. Further, his left ankle disability is rated as noncompensable, which indicates that the severity of the disability is less than moderate. See 38 C.F.R. § 4.31; 4.71a, Diagnostic Code 5271. Thus, the evidence suggests that, at most, the Veteran's left ankle condition might affect his ability to perform non-sedentary occupations. 

While the Veteran is service-connected for a fracture of the nasal bone, he has not asserted, and the record fails to reflect, that this disability has contributed to his claimed inability to obtain or maintain substantially gainful employment. 

Thus, the medical evidence of record is against a finding that the Veteran's service-connected disabilities prevented him from being able to obtain and secure substantially gainful employment prior to September 12, 2000. The Board acknowledges that the record indicates that prior this date, the Veteran's service-connected disabilities had some impact on his ability to perform certain work. However, the question before the Board is not whether the Veteran's service-connected disabilities affected his ability to secure and maintain substantially gainful employment, as rating criteria for service-connected disabilities contemplate impairment in earning capacity resulting from such disabilities, and the degrees of disability, in general, compensate for considerable loss of working time. See 38 C.F.R. § 4.1. Instead, the Board must determine whether the evidence establishes that the Veteran was unable to secure and follow any gainful occupation as a result of service-connected disabilities. See 38 C.F.R. § 4.16. 

In addition to the medical evidence of record, the Board has considered the Veteran's previous work experience, including his last position as a boiler room operator and reported laborer positions, in addition to his educational background. Particularly when considering the Veteran's varied work experience and educational background, which included college-level coursework in medical administrative assistance, the evidence indicates that the Veteran's service-connected disabilities did not preclude him from all substantially gainful employment, including sedentary employment, prior to September 12, 2000. 

The Board also acknowledges the Veteran and his family's lay assertions that he has been unable to work due to his service-connected disabilities since discharge from service. In stressing the severity of the Veteran's depression and its impact on his employability, the Veteran and his family have pointed to his suicide attempts in the 1970s. Additionally, his family noted that following service, the Veteran was not able to hold a job due to pain and discomfort in his legs and feet. The Board notes that with respect to the Veteran's suicide attempts in the 1970s, they predate the effective date of the award of service connection for depression and are therefore not pertinent to the question of whether the Veteran was entitled to a TDIU prior to September 12, 2000. Additionally, the Veteran and his family's contention that he was unemployable by reason of his service-connected disabilities prior to September 12, 2000, is outweighed by other evidence of record, particularly, the findings of the September 1998 and May 2000 VA examiner set forth above, who only found moderate functional impairment with respect to the Veteran's depression. See Caluza, 7 Vet. App. at 511. Further, there is no objective medical evidence to support a finding that the Veteran was unable to maintain employment due to pain and discomfort attributed to his Achilles tendonitis. Thus, while the lay statements of record indicate that the Veteran's service-connected disabilities might have affected his ability to engage in certain employment that involved regularly working with others or required standing for long periods of time, the competent medical evidence of record weighs against a finding that service-connected disabilities prevented him from obtaining and sustaining any kind of employment, including sedentary employment, prior to September 12, 2000. 

Finally, the Board acknowledges that SSA granted disability benefits in March 1994 for severe depression and personality disorder, effective November 1990. However, the Board is not bound by the SSA's findings of disability or unemployability because there are significant differences in the definition of "disability" under the Social Security and VA systems. See, e.g., Collier v. Derwinski, 1 Vet. App. 413, 417 (1991). Further, as SSA's determination was based on a combination of both service-connected and non-service connected disabilities, including personality disorder, it has limited probative value. 

In light of the foregoing, the Board concludes that the most probative evidence of record weighs against a finding that the Veteran's service-connected disabilities precluded him from securing or following substantially gainful employment prior to September 12, 2000. Although VA examination reports, medical treatment records, and lay statements indicate that the Veteran's service-connected disabilities affected his ability to perform in certain occupational environments prior to September 12, 2000, the evidence fails to support a finding that such disabilities rendered him unemployable. 

The Board does not doubt that the Veteran's service-connected disabilities had an impact on his employability prior to September 12, 2000. However, the 30 percent schedular evaluation that was in effect prior to that date contemplated industrial impairment resulting from service-connected disabilities. See 38 C.F.R. § 4.1. 

As the record of evidence does not indicate that the Veteran was rendered unemployable by reason of service-connected disability prior to September 12, 2000, the Board is not required to submit the Veteran's claim to the Director of Compensation Service for extraschedular consideration under 38 C.F.R. § 4.16(b). Cf. Bowling, 15 Vet. App. at 10. 

In considering the evidence of record, the Board has considered the applicability of the benefit-of-the-doubt doctrine. As the preponderance of the evidence is against the Veteran's claim, that doctrine does not apply, and the claim must be denied. See 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102. 

ORDER

Entitlement to a TDIU, prior to September 12, 2000, is denied. 

REMAND

As noted above, in October 2008, the Board remanded the issue of entitlement to an earlier effective date for DEA benefits for the RO to issue an SOC. Based on a review of the record, the RO has not issued an SOC with respect to this issue; therefore, the Board must remand the issue of entitlement to an earlier effective date for DEA benefits. See Manlincon v. West, 12 Vet. App. 238, 240-41 (1999) (providing that the Board must remand a matter when VA fails to issue an SOC after a claimant files a timely notice of disagreement); Stegall v. West, 11 Vet. App. 268, 271 (1998) (providing that the Board errs as a matter of law when it fails to ensure compliance with its prior remand instructions). The Board acknowledges that, in May 2014, the RO established basic eligibility to DEA benefits from September 12, 2000, the date upon which he was granted a 100 percent rating for depression. However, as an SOC, not a rating decision, is necessary for a claimant to perfect an appeal, a remand is necessary for the RO to issue an SOC to the Veteran so that he may submit a timely substantive appeal. See 38 C.F.R. § 20.302(b); Manlincon, 12 Vet. App. at 240-41; Holland v. Gober, 10 Vet. App. 433, 436 (1997). 

Accordingly, the case is REMANDED for the following action:

Issue a Statement of the Case pertaining to the Veteran's claim of entitlement to an earlier effective date for the grant of DEA benefits. The Veteran is advised that the Board will only exercise appellate jurisdiction over this claim if he perfects a timely appeal of it. 

The Veteran has the right to submit additional evidence and argument on the matter the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999). 

This claim must be afforded expeditious treatment. The law requires that any claim that is remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014). 

______________________________________________
MICHAEL LANE
Veterans Law Judge, Board of Veterans' Appeals

Department of Veterans Affairs